[Civ. No. 10652. Third Dist. Dec. 4, 1963.]

RUBY L. PETERS, Plaintiff and Appellant, v. JOHN A. MITCHELL, as Superintendent and Medical Director of DeWitt State Hospital, et al., Defendants and Respondents.

DeCristoforo & DeCristoforo and Joseph DeCristoforo for Plaintiff and Appellant.

Stanley Mosk, Attorney General, Willard A. Shank, Assistant Attorney General, and Lloyd Hinkelman, Deputy Attorney General, for Defendants and Respondents.

VAN DYKE, J.* — This is an appeal from a judgment of the Superior Court of Sacramento County denying appellant's petition for a writ of mandate and affirming the action of the State Personnel Board in discharging appellant from her employment at the DeWitt State Hospital, where she held the position of psychiatric technician, Department of Mental Hygiene. She was first employed in October 1947 and had served 11 years when she was discharged from her position by an order effective March 24, 1961. A hearing was held before a hearing officer of the State Personnel Board at which she was represented by counsel. The hearing extended

---

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

over 6 days, the hearing officer proposed findings and judgment upholding the charges of the head of the hospital. The proposed findings and judgment were adopted by the board. Mrs. Peters then petitioned the superior court in mandate, seeking reversal of the board's decision. The superior court denied the petition, and she appeals to this court.

 Appellant was charged in the notice of punitive action with inexcusable neglect of duty, wilful disobedience, and violation of section 84 of the "Rules and Regulations" of the Department of Mental Hygiene. Section 84 declares that "No employee shall strike, abuse, or mistreat a patient." In the notice of punitive action it was alleged that the circumstances by which the causes for punitive action arose were as follows: That appellant has been guilty of the following infractions of the rules and regulations governing the treatment of patients: (1) that during the period of June, July, August, September and October, 1960, she had "restrained to excess, Patient #1063"; (2) that on February 1, 1961, she had "restrained Patient #19362 to the toilet in the Water Section on said ward" (Ward 309); (3) that on February 2, 1961, on said ward she had "restrained Patient #19362 to the toilet in the Water Section of said ward, causing great discomfort and swelling to said patient's wrists and ankles." The findings proposed by the hearing officer and adopted by the board were that during the stated period appellant had "on numerous occasions restrained patient #1063 to the toilet in the Water Section on said ward"; that on February 1, 1961, she had "restrained patient #19362 to the toilet in the Water Section on said ward;" and that on February 2, 1961, she had "restrained patient #19362 to the toilet in the Water Section of said ward, causing discomfort and swelling to said patient's wrists and ankles." It was further found that in each of the instances, when the patients were restrained to the toilet, it had been "not for the purpose of insuring that toilet requirements would be met, but because said patients were difficult to handle and the toilet was a convenient place of restraint." Conclusions were drawn that appellant's acts and omissions had "constituted abuse and mistreatment of said patients, within the meaning of the above said rule, and 'inexcusable neglect of duty' and 'wilful disobedience,' within the meaning of subdivisions (d) and (o) of section 19572 of the Government Code, . . . ."

Doctor G. D. Tipton was Superintendent and Medical Di-

rector of DeWitt. There were a number of doctors, all of them licensed psychiatrists, who worked in the various wards at the hospital. For the five months in 1960 during which the board found that on numerous occasions appellant had restrained patient number 1063, Doctor Cleary was the physician in charge. During the two days involved in the restraint of patient number 19362, Doctor Jarrett was the physician in charge. Over several wards, including the ward that appellant worked on, there was a supervising psychiatric technician (a Mrs. Hood), and under her, and over the ward on which appellant worked, there was a psychiatric technician (a Mrs. Atwood) of a grade higher than that of appellant under whom appellant performed her duties. Appellant was in charge of the ward on which she worked during absences of her immediate superior. What may be called the chain of command, then, ran from the superintendent of the hospital to the doctor in charge of several wards, to the psychiatric technician with supervision over several wards, and last to appellant's immediate superior. It was shown that with respect to all technicians working on the wards the doctors were "bosses" and that it was the duty of those beneath them to carry out their orders concerning the treatment of patients. Doctor Tipton was not called to testify. Doctor Cleary was called to testify, and the following is substantially his testimony: During the period of June 1960 through October 1960 I was the medical director in the area to which Ward 320 was assigned. It was necessary to have the patient, Doris Gordon (number 1063) restrained occasionally to a toilet. She was violent and dangerous, both to herself and other people. It happened the toilet was the best available place at the time. There were other places where she could have been restrained. "At one time there was a room for seclusion. As far as I know, there is not one now. With three hundred patients, you can seclude only one at a time. Therefore, if she were secluded in the general ward she not only was incontinent and would soil the floors, but she was noisy and disturbed all the other patients. Therefore, it seemed the most practical thing at the moment. I would think that it was only for short periods she was so restrained, usually until she quieted down. She usually quieted down." I never at any time during the entire period ordered that Doris Gordon not be restrained on a toilet. I visited my wards, each one, at least once a day. Normal procedure was to find out first from the technician if anything unusual had

happened since I was there last. If so, it was dealt with. If not, I would wander through the ward talking to the patients, and in general, looking over what was happening. I did not go only to the ward office, I always went on the ward itself. I visited the patients to see what they were doing. I went past the bathrooms, the door was always open. Doris Gordon was a retarded patient. It was almost impossible to communicate with her. At times she became hyperactive and dangerous to herself and others. She would pound the walls. I had seen her in these fits innumerable times; I had seen her flailing her arms and kicking with her feet. We might assume that if an old or feeble patient got near her, the patient would get hurt. The restraint and seclusion orders in evidence were signed by me. For instance, on June 5, 1960, the ordered type of restraint was belt and cuffs, which usually is a belt that goes around the body and cuffs. When I gave an order for belt and cuffs, it was proper for a technician to use some other means of restraint if they were not available, or if merely soft ties were available, and in a place where they could be used, they were preferable. An order for belt and cuffs means any type of restraint within reason, and it is, more or less, up to the discretion of the technicians who are employing the restraint. If a patient requires any further restraint. I know about it before it is done. It is not required that whenever a patient is restrained on a ward that the doctor visit and check him. Doris Gordon was in restraint sometimes three times a day. It is a possibility that I would not see her when I visited the ward, even though she was then in restraint, but it is very remote. It was not the practice to sign a restraint order whenever I had seen a patient in restraint and approve of the restraint. The purpose of the reports is to keep the doctor informed of all patients who are under restraint. If a patient were not properly restrained even for one day and there were damage to the patient, that would be one day too much. I think there would have to be damage before restraint would be improper. It might be accidental. I was aware of the fact that Doris Gordon had been secured to the toilet on Ward 320 during the period of June through October 1960 on occasions. I had seen her there. I saw her secured to the toilet in this fashion fairly frequently over a period of 6 years. There were periods when I was not on the ward. I only know how long she was tied to the toilet from what the technicians said, but during the period June through October 1960, I did see this patient secured to the

toilet. I do not recall Mrs. Peters telling me about her restraint. Most of the time it was not her business to tell me about it. I talked to "the charge" and she was the "second." Mrs. Peters was in charge part of the time (when Mrs. Atwood was away). The reason she (Doris) was restrained to the toilet was because she was incontinent. We had no restraint room available apparently. She required frequent restraint, and, as I say, she was incontinent. The toilet was the best available place to restrain this patient at all times. Ward 214 is supposed to take care of disturbed patients. At one time we sent Doris Gordon there and the personnel on that ward were unhappy because she was too rough for the ward. When we were short of ward personnel it would take at least two technicians to convey her to Ward 214. They did not leave her on Ward 214 because it was not a continuing thing, and we tried to keep those beds free. If one of her episodes were at night, it would take two technicians off the ramp and leave it pretty thin. Therefore, it would be easier to restrain her right on the ward, more practical. It was more practical to secure her on the toilet than to send her to Ward 214, the disturbed ward. It was more to the point. She did not need to be continuously on Ward 214. I never specifically ordered her to be secured to the toilet. I inherited that type of restraint. I saw no reason to discontinue it, but I did not specifically order it. I have been in the hospital 6 years, and during that time I have seen other patients secured to the toilet for restraint purposes, off and on through all that time, and on other wards than 320. In my opinion, the toilet is not a proper place to restrain a patient. I do not like it, but it is what we have.

Doctor Jarrett testified in respect to the restraint of patient number 19362 (Delia Fiedler) to the toilet. He was the doctor in charge on her ward during the shift of service by appellant on that ward. He testified substantially as follows: I recall Delia Fiedler. She was a fairly quiet patient on the whole, but she did have disturbed periods, not severely disturbed, but periods when she was agitated—not necessarily physically, but mentally. She would manifest this by not talking, but later on she engaged in physical activities detrimental to herself. During the period of January and February 1961, her actions became different in that she would fall to the floor. I saw her do this. She would bruise herself. She became progressively worse. I gave restraint and seclusion orders for her. She would walk on freshly mopped

floors where patients have fallen and broken their hips. The fact that she was prone to throw herself on the floor aggravated this danger. I saw her go down on one occasion, but not on a wet floor. At that time the floor was dry. There was no apparent reason that I could see why she fell. When I was on the ward she tipped over a chair in which she had been restrained. I thought it a poor idea to restrain her in bed because she was incontinent, which made her very subject to bed sores. I thought that she should be restrained in some other manner. I gave restraint orders to Mrs. Atwood, Mrs. Dillon and Mrs. Peters. Mrs. Atwood was in charge of the ward, and Mrs. Peters was acting charge in her absence. I may well have communicated my orders to Mrs. Peters. On February 1, 1961, I saw the patient Fiedler in restraint on a toilet in the ward. (This was during the tour of duty of Mrs. Peters.) I would say this was approximately between nine and ten in the morning. I inspected her and the restraints. She was restrained on a toilet that had a metal frame surrounding it with arms. She had cuffs on her wrists and a white cloth restraint on her ankle. I checked the restraint to see if there was adequate room for circulation. I checked them all and that includes the cuffs on the wrists, the belt around the middle, and the restraints on the ankles. I could put two fingers between the patient's extremity and the restraint on each extremity. In my opinion, she was not tied too tightly to the restraining bars on the toilet. Mrs. Peters and I went over and I checked the patient. She was with me at that time. The only comment I made about the restraints was as I checked them. I did not express disapproval of the type of restraint. I was satisfied that the restraints were not too tight. I felt the toilet was as good a place as any since her patient had reached the point where she was wetting her dress and having bowel movements the same way. I felt in view of all the information I had with respect to her outbursts, her disturbed actions, this was the most effective place to restrain her. Mrs. Peters was justified in continuing the restraint in view of my inspection and my attitude. I did not tell her to take the patient out of these restraints. I gave instructions that the patient be released from restraint and walked periodically. This was a verbal instruction Mrs. Peters had written out. I saw the patient again the next day, February 2, in the morning. I do not recall whether she was back in that same restraint or not, but I saw her restrained on the toilet more than once. I think I saw her on the second day and went over

and examined her. The apparatus of restraint did not appear too much different. I was not paying too much attention to the material. I was still interested in the circulation and such things as this. I checked the circulation. I was satisfied the restraint was not applied too tightly at the time I saw the patient. The only expression I made on the ward that might be considered disapproval was that I said the patient should be walked periodically with this type of restraint, that is, taken off the toilet and walked, and that is the only expression at any time during this episode. On one of these two visits the ward personnel told me that there had been a complaint about this type of restraint. Either Mrs. Peters or Mrs. Atwood told me, I could not say which, but it was that the person making the complaint did not think it was a proper restraint. I told them that I had checked the patient and felt that she was all right. As far as the technicians on the ward are concerned, the doctor is the boss. Some supervisors question this, but the doctor is supposed to be the boss. The technicians do not question me very often.

Mrs. Hood, who was the principal witness against appellant, testified substantially as follows: On February 1, 1961, Mrs. Peters made the rounds with me. I looked in the toilet room and saw this patient (Delia Fiedler) tied to the chair or to the frame, and I said, ''What is this Mrs. Peters?'' She said, ''Well, that is Delia Fiedler, and she has been acting up, and I restrained her. I tied her to the toilet. ... The doctor knows about it.'' I went over and examined the stockings she was tied with, and I said, ''They are too tight, and anyway, stockings should not be used. Haven't you soft ties? Soft ties should be used.'' I said, ''Please speak to the doctor about it?'' She said the doctor said it was all right. I told her to loosen the ties and talk with the doctor again. She said, ''But the doctor told us to walk her, and we walk her twice on our shift of duty.'' I said, ''Well, [if] it is the doctor's orders,'' and she assured me that it was. I observed the patient's hands and feet were slightly swollen, but that was between 8:30 and 9 o'clock. There was some swelling in her hands, feet and ankles. I do not think it is proper to restrain a patient on the toilet like that. I have not seen other patients so restrained. The frames are for patients on the toilet for their personal needs, and I never saw a patient on them for purpose of restraint. I told Mrs. Peters to be sure to walk her and untie her when she was fed. She said, ''Yes, we will.'' On the following day we went to the ward in the

morning between 8:30 and 9. Mrs. Atwood was in charge. Mrs. Peters was second. I found the patient in the same position, tied on the toilet, a belt around her middle and cotton stockings on her wrists and ankles. I looked in the toilet, and I said, "What, the same one in the same place, ...?" Mrs. Atwood attempted to explain why. She said Mrs. Peters said the doctor said to restrain her, and she said, "She still—Delia is not good this morning, .... I thought we would just do it again." I said, "I don't think it is a good thing." Her ankles and hands were swollen. I examined the patient. I examined the ties and looked at her feet and ankles. "Q. Did Mrs. Peters say anything during the course of the conversation? A. No, Mrs. Peters had nothing to say during that time. Mrs. Atwood was in charge, and Mrs. Peters was just along. Then, I said, 'Well, I think I had better see about this, and ... I went on out, ...'" The patient's hands and feet were quite swollen that morning. I gave no orders to Mrs. Atwood or Mrs. Peters at that time. I went back to the office and turned it in to Mr. Speilman. He is my superior, the assistant superintendent of nurses. I received orders from him. I returned to the ward and told Mrs. Atwood we had to get the patient out of that—I had orders to take her out of ties of that nature. Those were Mr. Speilman's orders. I returned to the ward. I had no conversation with Mrs. Peters concerning the matter. I talked with Mrs. Atwood around 11:30 and Mrs. Peters was present. "I said, 'Mr. Speilman says she cannot be tied to a toilet frame,' and I told Mr. Spielman it is the doctor's orders, as Mrs. Peters had told me, and he said he didn't give a damn who gave an order like that, the old man would flip his lid." I said, "We cannot do this. We do not restrain patients to toilets." I came back to the ward after lunch. She was still on the toilet, restrained the same way, her wrists and ankles were swollen and blue, and her feet were blue. There was no technician there. I called Dr. Jarrett. Mrs. Peters was not there but Mrs. Atwood was. I asked him if he was aware of the patient's condition. He said, "Well, how do you mean?" I said, "She is tied to the toilet ...." He said, "She was in restraint I know that. The order is signed." I said, "Right, but ... her condition is not good. Would you permit us to take her down to 311 where we have a seclusion room and put her in that?" He said, "If you think it will do any good." He said he knew the patient was in restraint and that he had talked to Mrs. Peters. We untied the patient and took her to 311.

Although there was direct conflict as to the condition of the patient in respect to any swelling or bruising of her feet or ankles, we must here, of course, accept the testimony of Mrs. Hood.

Summarizing the situation presented by the record as to restraint to toilets when patients were disturbed and for purposes other than biological, it appears that this manner of restraint was not initiated by appellant. It was known to the staff physicians in charge of the ward she worked on, and orders for restraint were in force as to both patients when they were restrained. Neither the orders nor any written rules or regulations concerning the care of patients specifically forbade the restraint of patients to the toilet frames for purposes of restraint. There was no proof that prior to the happenings with which we are here concerned appellant was ever told that such restraints to toilet frames was in and of itself improper, provided, of course, that the application of restraints was not such as to injure the patient. Appellant testified that she had received no such instructions or orders, had no knowledge that such restraints were considered wrong. It does not appear that she, alone, was in charge of either patient in the sense that it was her sole responsibility as to whether or not there should be restraints and as to what kind of restraints. These patients were restrained by others when appellant was not on duty. As the testimony shows, the doctors, who were her bosses, knew the patients were restrained to the toilet seats on occasion when it was not necessary except for purposes of restraint; and such restraint was not only observed by the doctors but the restraints were examined and tested to see whether or not they were in anywise harmful to the patient.

Turning now to the restraint of Delia Fiedler on February 2, 1961, concerning which alone there was the finding, not only, that she had been restrained to the toilet by appellant when it was not necessary except for restraint but also that the applied restraint had injured the patient, the evidence is that on that morning when appellant went on shift with her superior, Mrs. Atwood, Delia was already restrained on the toilet; that she was taken off, exercised and placed back on. There is no proof that appellant made any decision as to the propriety of that action at that time. On the contrary, it is shown that Mrs. Atwood was in charge and was active in placing the patient back on restraint. There is no evidence that Mrs. Peters disobeyed any order after Mrs. Hood ob-

jected to that type of restraint, took the matter up with her superior, Mr. Speilman, and received his order to change the restraints. Mrs. Atwood was there at all times and was in charge. When Mrs. Hood called Doctor Jarrett later and informed him of the situation as she saw it, he told her he had known of the restraint, had checked the restraints that morning, and had found them all right. She then asked him for permission to move the patient to a different ward, received that permission, and superintended the removal of the patient.

The proof does not show that appellant was guilty of any wilful disobedience in respect to any matter with which we are here concerned. ▆ Wilful disobedience connotes a specific violation of command or prohibition. (*Coomes* v. *State Personnel Board*, 215 Cal.App.2d 770 [30 Cal.Rptr. 639].) ▆ Neither was she, under the circumstances, shown guilty of inexcusable neglect of duty within the meaning of section 19572 of the Government Code. It has been held that in order to be guilty of such neglect of duty it must appear that the act was done intentionally, designedly and without lawful excuse. (*Rapaport* v. *Civil Service Com.*, 134 Cal.App. 319 [25 P.2d 265]; see also *People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974].) ▆ When all that is done by an employee, such as appellant, has been done before by others, is not in violation of any specific order or direction from her superiors, and is done under the supervision of her superiors and under their direct examination and control, it cannot be said that the doing of it is in anywise inexcusable as having been done without just cause or excuse. ▆ It is conceded throughout that these patients had to be restrained to prevent them from injuring themselves and from injuring others, including the technicians; and we are referring to restraints imposed for restraint alone. There is no finding that these patients were ever restrained, either by appellant or by others, when restraint was unnecessary for their protection and for the protection of others. In short, the evidence is that they had to be restrained, and the issue is only as to where and how restraint should be imposed. It would have been highly improper to have left them unrestrained and subject to suffering harm, or doing harm, because of their want of restraint. Under the facts here, if there was impropriety, it cannot be charged to appellant.

The judgment appealed from is reversed, and the trial court is instructed to issue a writ of mandate directing the

State Personnel Board to annul appellant's dismissal and to reinstate her to her position with payment of such back salary as is authorized by law.

Pierce, P. J., and Friedman, J., concurred.

Respondents' petition for a rehearing was denied December 31, 1963, and their petition for a hearing by the Supreme Court was denied January 29, 1964. Schauer, J., McComb, J., and Peters, J., were of the opinion that the petition should be granted.