Filed 6/13/13  Morrison v. State Personnel Bd. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JOANN MORRISON, | C069749 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201080000731CUWMGDS) |
| v. | |
| STATE PERSONNEL BOARD et al., | |
| Defendants; | |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION et al., | |
| Real Parties in Interest and Respondents. | |

Plaintiff Joann Morrison was terminated from her employment with the Department of Corrections and Rehabilitation (the Department) at California's Pelican Bay State Prison after a random drug test revealed the presence of marijuana in her system.  The State Personnel Board (the Board) upheld the termination.

1

Plaintiff appeals from the trial court's judgment denying her petition for a writ of mandate seeking to overturn the Board's decision. She contends the findings and conclusions of the Board are not supported by substantial evidence; the Board misapplied federal law in finding her guilty of other failure of good behavior; and the penalty of dismissal is inappropriate. We disagree with plaintiff's contentions and affirm the judgment.

FACTS AND PROCEEDINGS

On September 16, 2000, having completed approximately three months of training with the Department, plaintiff began her employment as a correctional officer at Pelican Bay State Prison. Plaintiff's training included information regarding the Department's policy on random drug and alcohol testing as outlined in the "CDC 1875," the Department of Personnel Administration (DPA) rules, title 15 of the California Code of Regulations, applicable sections of the Department's Operations Manual, and applicable sections of the Bargaining Unit 6 Memo of Understanding (MOU).

Plaintiff first considered using marijuana to treat her chronic insomnia in 2004 after learning about the legalization of the drug in newspaper articles and on television. In June of that year, she discussed with her primary care physician the possibility of using medicinal marijuana, but did not obtain a recommendation at that time.

In late-October 2004, plaintiff discussed with her supervisor, Lieutenant Mark Ferguson, the possibility of using marijuana for medicinal purposes. She later testified that Lieutenant Ferguson gave her a copy of a page from the Department's Operations Manual entitled "Employee Disciplinary Matrix" (matrix), which states that an employee is subject to discipline for "[u]se or possession of marijuana, illegal drugs, or narcotics unless medically prescribed." According to plaintiff, Lieutenant Ferguson told her she would not be terminated for using marijuana as long as it was "medically prescribed, legally prescribed."

2

Plaintiff was eventually referred to Dr. Ken Miller, who gave her recommendations for medical marijuana in February 2005, October 2006, and December 2007. She obtained subsequent recommendations from Dr. Miller's successor, Dr. Diane Dickinson. Plaintiff took her initial recommendation to the county Department of Health and Social Services, and obtained a Proposition 215 card (otherwise known as a Prop 215 card). She believed at the time that the recommendation was a "legal prescription" proving she could legally use marijuana.

Plaintiff first obtained marijuana in March 2005 from the Humboldt Patient Resource Center, and thereafter purchased about an eighth of an ounce every three months. She believed her purchase of marijuana was legal because she "followed all the laws in the State of California." Plaintiff used marijuana two to three times a month, but never used it during the work week. She continued using the drug until February 14, 2009.

Plaintiff was selected for random drug testing on February 17, 2009. The next day, she and her union representative informed the medical review officer (MRO) and Linda Perry, the employee relations officer (ERO) and substance abuse testing coordinator at the time, that she "had a legal prescription for medical marijuana" and might test positive.

On February 23, 2009, plaintiff was notified she had indeed tested positive for marijuana.

On April 1, 2009, the Department issued a notice of adverse action dismissing plaintiff from her employment at the prison based on allegations she violated Government Code section 19572, subdivision (d) [inexcusable neglect of duty], and subdivision (t) ["[o]ther failure of good behavior either during or outside of duty hours which is of such a nature that it causes discredit to the appointing authority or the person's employment"], as well as "Title 15, California Code of Regulations, applicable

3

sections of the CDCR Operations Manual, and a section of the Bargaining Unit 6 Implementation Plan . . . ."  (Italics omitted.)

Plaintiff appealed to the Board.  Following a contested hearing before an administrative law judge (ALJ), the Board, on June 10, 2010, adopted the proposed opinion of the ALJ upholding plaintiff's termination.  The ALJ's findings included the following:  (1) plaintiff was aware she was subject to random drug testing; (2) plaintiff asked her supervisor, Lieutenant Ferguson, about the use of medical marijuana.  According to plaintiff, Lieutenant Ferguson told her use of medical marijuana would not subject her to discipline; (3) plaintiff did not contact the ERO, the return to work coordinator (RWC), or any other supervisor to inquire about whether her use of medical marijuana violated the Department's substance abuse policy; (4) plaintiff was unaware of the distinction between a doctor's recommendation and a doctor's prescription; (5) plaintiff admitted she did not obtain her medical marijuana from a pharmacy or by using a doctor's prescription; (6) the Department clarified its position on the use of medical marijuana in a memo dated January 16, 2007, from Undersecretary K. W. Prunty to all staff (the Prunty memo); (7) plaintiff did not recall receiving the Prunty memo; and (8) Sergeant Donald Wolf, master trainer for the Department, was unaware of the Prunty memo until three weeks prior to the hearing.

The Prunty memo includes the following language:

"This memorandum is to provide clarity on the subject of the impact of the use of medical marijuana when an employee is subject to a departmental substance testing program.  It is hoped that the following information is helpful to you and clears up any misconceptions that may exist on the subject of medical marijuana.  [¶] . . . [¶]

"No Legal Prescription for Medical Marijuana  [¶] . . . [¶]

"A State employee must not use drugs with a legal prescription, if it poses a threat to the health and safety of the employee and others.  However, as stated in the Health and Safety Code, physicians cannot legally prescribe medical marijuana; they may only

4

recommend its use.  Therefore, there is no legal justification that will protect an employee from the consequences of a positive drug test for the presence of the metabolites of marijuana.  [¶] . . . [¶]

"In conclusion, if an employee tests positive for marijuana as a result of a reasonable suspicion or random substance test, whether it is for alleged medical purposes or not, he or she will be subject to the disciplinary action outlined in the Employee Disciplinary Matrix under Controlled Substances."

In sustaining the charge of inexcusable neglect of duty, the ALJ found plaintiff was aware of the Department's drug-free policy and her duty to refrain from the use of drugs.  Further, the ALJ found that plaintiff's academy training (which occurred after the passage of Proposition 215) gave her no grounds upon which to base a belief that medical marijuana was an exception to the Department's substance abuse policy even though she developed a belief otherwise.  While plaintiff's belief was reinforced by her conversation with Lieutenant Ferguson, she did not call him as a witness, nor did she make any effort to confirm the information she claimed to have obtained from him with any other authority at the Department, or produce any documentation demonstrating medical marijuana was exempt from the Department's drug-free policy.  While noting that "there may have been some confusion among [the Department's] employees about the use of medical marijuana," the ALJ found plaintiff failed to make further inquiry about the Department's policy regarding the use of medicinal marijuana, and in any event admitted she did not obtain her marijuana using a prescription or from a pharmacy.

In sustaining the charge of failure of good behavior, the ALJ concluded that while plaintiff's use of marijuana pursuant to a physician's recommendation may not have subjected her to criminal prosecution under state law, it nonetheless subjected her to potential prosecution under federal law.  As such, plaintiff's use of marijuana, coupled with her positive test for marijuana while on duty, violated federal law and thus constituted a failure of good behavior.

5

In sustaining the penalty of dismissal, the ALJ found that "[a] peace officer's job is a position of trust and the public has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer," and concluded that, because plaintiff "violated [the Department's] substance abuse policy as well as federal law," her conduct resulted in, or if repeated is likely to result in, harm to the public service.

Plaintiff filed a petition for writ of administrative mandate in the superior court. The court denied the writ petition, concluding among other things that there was substantial evidence plaintiff had notice of the potential for discipline for her use of medical marijuana even with a physician's recommendation. Plaintiff timely appeals.

DISCUSSION

I

*Standard of Review*

In reviewing disciplinary actions, "the Board acts in an adjudicatory capacity," "much as a trial court would in an ordinary judicial proceeding. Thus, the Board makes factual findings and exercises discretion on matters within its jurisdiction. On review, the decisions of the Board are entitled to judicial deference. The record must be viewed in a light most favorable to the decision of the Board and its factual findings must be upheld if they are supported by substantial evidence. [Citation.] In addition, the Board's exercise of discretion must be upheld unless it abuses that discretion." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 823; see also *Fiske v. State Personnel Board* (1957) 147 Cal.App.2d 631, 633 ["all conflicts must be resolved in favor of the findings of the board and all legitimate and reasonable inferences indulged in to uphold their decision"].) Abuse of discretion is shown if the Board's decision is not supported by its findings. (See Code Civ. Proc., § 1094.5, subd. (b).)

6

" 'Substantial evidence' requires evidence of 'ponderable legal significance.' [Citation.]  It is not synonymous with 'any' evidence.  The evidence considered must be reasonable, credible, and of solid value and must be 'substantial' proof of the essential elements of the case.  [Citation.]  In assessing whether substantial evidence exists, we consider all evidence presented, including that which fairly detracts from the evidence supporting the Board's determination." (*Newman v. State Personnel Bd.* (1992) 10 Cal.App.4th 41, 47.)  "The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." (*Department of Parks & Recreation v. State Personnel Bd., supra,* 233 Cal.App.3d at p. 831.)  It is presumed that the Board regularly performed its duty, and the burden is on the appellant to prove otherwise.  (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 225.)

Our scope of review on appeal from a judgment in a case like this is identical to that of the trial court.  (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584.)

II

*Sufficiency of Evidence to Support Inexcusable Neglect of Duty*

Plaintiff contends the charge of inexcusable neglect of duty (Gov. Code, § 19572, subd. (d)) was not supported by substantial evidence in light of the evidence and testimony she presented establishing her use of marijuana complied with the Compassionate Use Act of 1996 (CUA) (Health & Saf. Code, § 11362.5).  In particular, she claims that, although she knew she was subject to random testing for illegal substances and one of those illegal substances was marijuana, she had a good faith belief her use of marijuana pursuant to the CUA was "legal" and would neither violate the Department's policies nor subject her to dismissal.  That good faith belief was reinforced, she contends, by her reading of the matrix, which, according to her, subjects an employee

7

to discipline for use or possession of controlled substances, including marijuana, "unless medically prescribed." We are not persuaded.

"It has been held that in order to be guilty of [inexcusable] neglect of duty it must appear that the act was done intentionally, designedly and without lawful excuse." (*Peters v. Mitchell* (1963) 222 Cal.App.2d 852, 862; see also Gov. Code, § 19572, subd. (d).) That is, "the person knows what he is doing and intends to do what he is doing." (*Coomes v. State Personnel Board* (1963) 215 Cal.App.2d 770, 775.)

There is substantial evidence to support the Board's finding that plaintiff acted intentionally. As plaintiff acknowledges, she received, at or about the time she was hired, documentation regarding the Department's policy on substance abuse and alcohol testing, and she knew from reading those documents that marijuana was a prohibited drug, screened for in random drug tests to which she was subject in her position as a correctional officer. According to that documentation, the Department's policy clearly prohibits the use of marijuana. For instance, the documentation on Bargaining Unit 6 Random Testing states that prohibited drugs include marijuana, and identifies "Marijuana/Cannabinoids (THC)" among the substances to be tested. Nonetheless, plaintiff knew the substance she was purchasing was marijuana, and intended to and did use that substance, resulting in a positive test.

Plaintiff testified she relied on her conversation with Lieutenant Ferguson, and the matrix she obtained from him, in making her decision to obtain and use marijuana, concluding that, "[t]o use marijuana, it's illegal unless medically prescribed, so an officer, if they didn't have a legal prescription for it, would be subject to disciplinary [*sic*] or termination, but if you have a legal prescription for it, then you're not going to be subject to termination."

Plaintiff's stated reading of the disciplinary matrix ignores the ambiguity inherent in the language set forth in that portion of the matrix on which she relies. The matrix says that discipline can be imposed for the "[u]se or possession of marijuana, illegal

drugs, or narcotics unless medically prescribed." It is poorly worded, at the very least. In its current state, the language can be read to say that discipline could be imposed for use of marijuana "*unless medically prescribed*," but it can also be read to say that discipline can be imposed for use of marijuana, illegal drugs, or narcotics unless *those narcotics* are medically prescribed. That is, the phrase relating to a medical prescription modifies only the words "narcotics" and not the words "marijuana" or "illegal drugs." Indeed, the latter is the more logical reading of the wording.

In either event, plaintiff did nothing to make sure her reading of the language was correct. She acknowledged that Ferguson, who she did not produce at the hearing to testify, was not the ERO at the time, and that she did not seek out the ERO to inquire about the disciplinary matrix or how the use of medical marijuana applied. Plaintiff admitted she did not contact her union representative to inquire about potential discipline for the use of medicinal marijuana. Nor, as the Board found, did she contact the RWC or any other supervisor to determine whether her use of marijuana violated the Department's substance abuse policy. In short, she did nothing to confirm whether there was, in fact, an exception to the Department's policy for medicinal marijuana and, if so, how to obtain and use the drug in a manner that would not subject her to disciplinary action. Moreover, there is no evidence to suggest that plaintiff took any steps at any time to confirm her apparent belief that a doctor's *recommendation* was the same as a *medical prescription*, as those words are used in the disciplinary matrix.

Plaintiff points to the Prunty memo as evidence of confusion within the Department and across the state regarding whether notice of random drug testing was sufficient to warn correctional officers that use of marijuana for medicinal purposes was prohibited. She contends evidence in the record suggests the Prunty memo was never disseminated and thus she was never made aware of its existence and "was never apprised that using marijuana under a doctor's care would subject her to termination." We reject plaintiff's claim for several reasons.

9

First, while the Board found "plaintiff could not recall receiving the [Prunty memo]," our review of the record confirms the trial court's observation that, "although [plaintiff] testified generally that she never became aware of any [Department] policy on medical marijuana, she never testified specifically that she was unaware of the [Prunty memo]."

Next, as the trial court pointed out, the Prunty memo expressly states it was directed to "All Staff." The memo was dated January 16, 2007, more than two years before plaintiff's drug screening. While Correctional Sergeant Wolf, a master trainer for the Department, testified he had no knowledge of the Prunty memo until three weeks prior to the hearing, he also testified he found the memo after searching for it on the Department's intranet website, thus supporting the reasonable inference drawn by the trial court, one which we draw as well, that the Prunty memo was "widely distributed, that it was available to [plaintiff], and that she knew of it."

Further, plaintiff did not dispute at the hearing the fact that the Department has at all times had a policy generally prohibiting the use of marijuana, and that she was informed of that policy during her training in 2000. While she claims she was "never apprised that using marijuana under a doctor's care would subject her to termination," she knew from the Department's general anti-drug policy and from the language of the matrix upon which she relied that she would be subject to discipline for use of marijuana without a medical prescription. As the Board found, she produced no evidence of any representation by the Department permitting the use of medicinal marijuana with only a physician's recommendation which obviously is not the same as a medical presecription.

Plaintiff contends the evidence does not support the finding that the Department's anti-drug policies provided to her during her academy training were sufficient notice that she was prohibited from using medicinal marijuana. In particular, she contends the evidence demonstrated that cadets were only instructed about "the broad canons of ethical behavior" and told they were subject to random urinalysis, but are not instructed

10

regarding the use of marijuana for medicinal purposes, nor were they told whether marijuana can be prescribed or recommended by a physician. From that evidence, she argues, the ALJ drew "an arbitrary inference" that simply because plaintiff knew she was subject to random drug testing, she therefore knew the Department prohibited medicinal marijuana.

Again, plaintiff ignores her own testimony that she not only knew she was subject to random drug tests, she also knew marijuana was considered by the Department to be an illegal substance and therefore a prohibited drug for which the Department tested. She also knew she would be subject to discipline for use or possession of marijuana without, at least, a medical prescription. As the Board found, she did not produce any documentation to demonstrate that medical marijuana was exempted from the Department's drug-free policy or that the policy permitted use of marijuana pursuant to a physician's recommendation. Moreover, she did not produce Lieutenant Ferguson to provide corroborating testimony despite that, other than Ferguson, there was no other Departmental employee or union representative upon whom she relied in concluding that her use of marijuana for medicinal purposes would not subject her to discipline.

Plaintiff relies on *Valenzuela v. State Personnel Bd.* (2007) 153 Cal.App.4th 1179 (*Valenzuela*), as further support for her claim of inadequate notice regarding the Department's policies on the use of medicinal marijuana. In that case, Valenzuela, a correctional officer employed by the Department, obtained a prescription for weight loss pills called Esbelcaps from a Mexican doctor. After filling the prescription legally and taking the drug, Valenzuela was randomly drug tested by his employer. He tested positive for amphetamine, a byproduct of the medication, and was dismissed from his employment. (*Id.* at pp. 1181-1182.)

Valenzuela appealed to the Board. The evidence evinced at the administrative hearing included an undated memo warning Department employees not to obtain medications from a foreign country without a prescription from a physician in the United

11

States, and further warning that "Mexican diet pills may contain powerful stimulants which are or may be metabolized into amphetamines [listing several by name, including Esbel]." (*Valenzuela, supra,* 153 Cal.App.4th at p. 1182.) Also admitted into evidence was another memo dated May 9, 2000, sent by the medical review officer to drug and alcohol coordinators explaining his January 6, 2000, memo regarding Mexican diet pills and repeating the information in the first memo regarding the metabolization process. Neither memo contained information about its source or distribution. (*Ibid.*) Valenzuela testified he heard about, but had never seen, the earlier memo and did not know the names of any of the prohibited medications. (*Ibid.*) Based on the two memos and testimony from the medical review officer that he advised employees in 2000-2001 not to take medication from Mexico, the Department argued employees were told not to obtain Mexican medications of the sort obtained by Valenzuela. (*Id.* at p. 1183.) The Board sustained the dismissal, concluding Valenzuela was provided adequate notice of the danger of taking the prescription of amphetamines for routine weight loss programs. (*Ibid.*)

Valenzuela brought a petition for writ of administrative mandate in the superior court claiming his dismissal was not supported by substantial evidence. The superior court agreed and granted the petition, finding the Department failed to present substantial evidence Valenzuela had legally adequate notice warning him that the Mexican prescription could result in a positive test for amphetamines when there was no evidence he was ever given, or had ever read, such a warning either at work or during training. (*Valenzuela, supra,* 153 Cal.App.4th at pp. 1183-1184.)

The Department appealed. The court of appeal agreed with the trial court. First, because the parties' experts agreed that the prescribed medication was not in and of itself an amphetamine, but rather a substance metabolized by the body into an amphetamine as a byproduct, the court took issue with the Board's finding that " 'prescription of amphetamines for routine weight loss programs is prohibited in the United States and

12

Valenzuela was on notice as to the danger of taking *such prescriptions*.' " (*Valenzuela, supra,* 153 Cal.App.4th at p. 1186.) Next, the medical review officer's testimony that he told employees on a general basis not to take Mexican diet pills did not demonstrate an established Department policy of notifying employees regarding the exact nature of the prohibited conduct. (*Ibid.*) Finally, there was no evidence as to how, if at all, the two 2000 memos were distributed. (*Id.* at pp. 1186-1187.) Affirming the lower court's judgment, the appellate court concluded, "The Department did not prove with substantial evidence that its employees in general or Valenzuela in particular were placed upon sufficient constructive or actual notice of the precise nature of the conduct that would constitute a violation of the employer's published standards." (*Id.* at p. 1187.)

This case differs from *Valenzuela* in several key respects. First, Valenzuela obtained a legal prescription and used that prescription to legally obtain his medication. In this case, plaintiff did neither. Next, the medicine Valenzuela obtained was not in and of itself a prohibited amphetamine, and only became so after being used and having metabolized in Valenzuela's system. Thus, it appears that mere possession of the medicine prescribed to Valenzuela was legal. Here, in comparison, the drug obtained by plaintiff was marijuana and, in and of itself, prohibited at the moment plaintiff obtained it. Finally, whereas in *Valenzuela* there were no published standards, just policy promulgated by word-of-mouth or memoranda distributed to an unidentified number of employees, here the Department's policy was published not just in documents provided to plaintiff during training. From those published documents, plaintiff admittedly knew the use of marijuana was prohibited at least in the absence of a medical prescription.

In addition, as previously discussed, there is sufficient evidence from which to infer the Prunty memo was widely distributed to employees on the Department's intranet website and that it was available to plaintiff.

There is substantial evidence to support the Board's finding of inexcusable neglect of duty.

13

## III

### *Other Failure of Good Behavior*

In sustaining the charge of other failure of good behavior (Gov. Code, § 19572, subd. (t)), the Board found that, while plaintiff's "use of marijuana based upon a physician's recommendation may not have subjected her to criminal prosecution in California state courts[, i]t nonetheless subjected her to possible prosecution under federal law," citing *Gonzales v. Raich* (2005) 545 U.S. 1, 26-29 (*Raich*). As such, the Board concluded, plaintiff broke the law she was sworn to uphold by using marijuana and testing positive, thereby discrediting herself and the Department.

Plaintiff contends the Board misapplied the *Raich* case, arguing *Raich* "addressed a narrow jurisdictional issue pertaining to Congress's Commerce Clause and not the prosecution of medicinal marijuana users under federal law." We disagree.

In *Raich,* the United States Supreme Court, finding the application of provisions of the Controlled Substances Act criminalizing the intrastate manufacture, distribution or possession of marijuana did not violate the Commerce Clause, upheld Congressional authority to regulate locally cultivated medical marijuana. (*Raich, supra,* 545 U.S. at pp. 8-9.) The court observed that, because "Congress classified marijuana as a Schedule I drug" (21 U.S.C. § 812(c)), but for one exception not relevant here, possession and use of marijuana is a criminal offense under federal law. (*Raich,* at p. 14.)

Here, the Board's reliance on *Raich* for the limited proposition that federal law prohibits the possession of marijuana was proper. Even assuming otherwise, we need not rely solely on *Raich* as support for that proposition. The fact that possession of marijuana is subject to federal criminal prosecution is clear from federal statutory law (21 U.S.C. §§ 812, 844(a)), and an abundance of federal and California case authority (see *United States v. Oakland Cannabis Buyers' Cooperative* (2001) 532 U.S. 483, 491-495 [149 L.Ed.2d 722]; *City of Garden Grove v. Superior Court* (2007) 157 Cal.App.4th 355, 382 ["The upshot of *Raich* is that the federal government and its agencies have the authority

14

to enforce the federal drug laws, even in a state like California that has sanctioned the use of marijuana for medicinal purposes"]; *County of Butte v. Superior Court* (2009) 175 Cal.App.4th 729, 739 ["the [CUA] has no effect on marijuana arrests and prosecutions or searches and seizures under federal law"]; *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 926 [state law cannot completely legalize marijuana for medical purposes because the drug remains illegal under federal law, even for medical users].)

IV

*Penalty of Dismissal*

Plaintiff contends the Board's decision to impose the penalty of dismissal was supported by three nonprecidential State Personnel Board decisions, all of which are distinguishable and none of which were accessible to her, thus violating her right to due process. As we shall explain, the Board relied on a published decision to support its decision, and thus plaintiff's claim lacks merit.

The record makes clear that the Board first identified that the factors to be considered in determining the proper penalty, if any, to impose include the extent to which plaintiff's conduct resulted in, or if repeated is likely to result in, harm to the public service, as well as "the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly v. SPB* (1975) 15 Cal.3d 194, 218.)

Next, acknowledging its history of decisions finding correctional officers are "peace officers" and are "held to a higher standard of conduct than non-peace officers," the Board observed that the public "has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer" and noted that the CUA "did not change the drug testing requirements [plaintiff] was under, or shield [her] from prosecution in federal court."

Finally, the Board likened the facts before it to those in *Joseph Garcia* (1998) SPB Dec. No. 98-03 [1960 CA St. Personnel Bd. LEXIS 13, May 5-6, 1998] (*Garcia*), a published decision in which the Board sustained the dismissal of Garcia, a parole agent

15

employed by the Department of the Youth Authority, for admittedly having smoked marijuana on one occasion in a motel room while off-duty. There, the Board found Garcia's duties included "enforcing the conditions of his wards' parole, investigating parole violations, gathering information which could cause a change in parole status, and apprehending parole violators." (*Garcia,* at p. 10.) Given that a ward's parole could be revoked if he or she were discovered smoking marijuana, "the Department could not condone a parole agent engaging in the type of behavior that could cost one of his parolees his freedom." (*Garcia,* at p. 11.)

The Board also found peace officers like Garcia "are held to a higher standard of behavior than non-peace officers," and "may be disciplined for violating laws they are employed to enforce." (*Garcia, supra,* SPB Dec. No. 98-03, at p. 12.) Finally, the Board found that because it is imperative that parole officers "maintain their credibility with parolees, some of whom may have been incarcerated for crimes relating to the sale or use of marijuana," Garcia's admitted use of marijuana could have a significant adverse impact on his credibility both with his parolees and the community. (*Garcia,* at p. 13.) The Board concluded the penalty of dismissal for Garcia's one-time use of marijuana was not unreasonable under the circumstances. (*Garcia,* at pp. 14-20.)

Here, the Board found the *Garcia* case was "equally applicable" and concluded that while plaintiff testified she now understood she was prohibited as a correctional officer from using marijuana pursuant to a physician's recommendation, dismissal was appropriate because she nonetheless violated Department policy and federal law. Given the substantial evidence to support the charges of inexcusable neglect of duty and other failure of good behavior as previously discussed, the Board's decision is supported by its findings.

Plaintiff takes issue with the fact that the Board made note of three nonprecedential State Personnel Board decisions "involving similar, if not almost identical facts," in which the penalty of dismissal was sustained. It appears to us,

16

however, that the Board relied entirely on *Garcia* in reaching its penalty determination, only mentioning the three nonprecedential decisions for the purpose of highlighting the fact that it has, in the past, taken the same position on penalties imposed in cases dealing with marijuana use. In any event, we need not consider the three nonprecedential decisions in rejecting plaintiff's claims, given that the Board properly relied on *Garcia,* and its findings related thereto were supported by substantial evidence.

Plaintiff cites *People v. Mower* (2002) 28 Cal.4th 457, 482, in support of her claim that her conduct was legal under California law pursuant to the CUA and therefore public policy disfavors the penalty of dismissal. In particular, she cites the following language: "As a result of the enactment of [the CUA], the possession and cultivation of marijuana is no more criminal--so long as its conditions are satisfied--than the possession and acquisition of any prescription drug with a physician's prescription." (*Mower*, at p. 482.) That language makes plain that the CUA still requires that one satisfy its conditions, just as one would be required to satisfy the conditions required to obtain prescription painkillers, namely, obtain a legal prescription from a physician and use that prescription to legally acquire the drug. We need not repeat our discussion in parts II and III, *ante*, but to note again that plaintiff did not satisfy the conditions for the use of medical marijuana set forth in the Act.

More importantly, however, we review plaintiff's conduct and argument not only in the context of the CUA and California law, but also against the backdrop of what is expected of a correctional officer working in the California prison system. In that regard, we echo the Board's finding that correctional officers are peace officers in whom the public invests the power and authority to enforce the law. While public policy might otherwise disfavor punishment of an ordinary citizen who satisfies the conditions of the CUA, plaintiff is a correctional officer and, as such, is required to act in a manner that is above reproach. Her actions were inconsistent with her duties as a correctional officer.

17

(*Garcia, supra*, SPB Dec. No. 98-03, at p. 18.)  There is no violation of public policy here.

DISPOSITION

The judgment denying the petition for a writ of mandate is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


          HULL          , J.

I concur:


      NICHOLSON     , Acting P. J.


I concur in the result.


      ROBIE          , J.